IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

```
FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING
2015 OCT 22  PM 4 35
STEPHAN HARRIS, CLERK
         CASPER
```

| | |
|---|---|
| CHRISTOMPHER GAGE and HEATHER GAGE, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Case No. 1:14-CV-00193-SWS |
| ) | |
| OVATION BRANDS, ) | |
| f/k/a BUFFET'S, INC. d/b/a OLD ) | |
| COUNTRY BUFFET ) | |
| ) | |
| Defendant. ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS MATTER came on for a hearing before the Court on August 26, 2015. The Plaintiffs, Chris and Heather Gage, were present and represented by their attorneys, Robert G. Pahlke and Kyle J. Long of The Pahlke Law Group and Ian K. Sandefer of Fuller, Sandefer & Associates, Attorneys at Law, LLC. Defendant failed to appear at the proceeding although notice of the lawsuit was duly given.

The Clerk having previously entered Default on November 5, 2014, in favor of Plaintiffs and against Defendant (ECF No. 9), and the Court having previously entered Partial Default Judgment in favor of Plaintiffs and against Defendant on sum certain damages in the amount of $641,936.50 on June 30, 2015 (ECF No. 15), the matter was scheduled for a hearing to determine fair and just damages on all non-sum certain damages due Plaintiffs, as provided by law.

The Court proceeded to hear evidence and receive exhibits submitted in support of

1

Plaintiff's claims, including, but not limited to, the testimony from Dr. Terry Mark Himes, Plaintiff Christopher Gage, and Plaintiff Heather Gage. The Court also received the Declaration of Dr. Jason D. Walsh Under Penalty of Perjury, one of Plaintiff Christopher Gage's treating surgeons. At the conclusion of the hearing, the Court left the record open to permit testimony from Plaintiffs' life care planner, who was ill and admitted to an assisted nursing facility prior to and during the hearing.

The matter was set for a closing statement on October 1, 2015 (ECF No. 23). At that time the Court received the Declaration of Dr. Michael D. Shinnick Under Penalty of Perjury and his Life Care Plan for Chris A. Gage. The Court, on October 9th, granted Plaintiffs' *Motion to Reopen Evidence* and received into evidence the Declaration of Dr. Jerome F. Sherman Under Penalty of Perjury, which included Dr. Sherman's résumé and economic report reducing future medical and care costs to present value (ECF No. 26).

Plaintiffs' Complaint asserts five claims for relief: Product Liability; Failure to Warn; Negligence; Breach of Warranty; and Loss of Consortium. Plaintiffs also allege punitive damages in their Complaint. First, the Court notes that Plaintiffs did not pursue punitive damages at the hearing over this matter, so the Court will not address punitive damages herein. Second, as each cause of action has been proven by default, the Court will focus solely on the damages available to Plaintiffs under Wyoming law for personal injuries and loss of consortium, as those include all damages available to Plaintiffs as part of their claims.

## **FINDINGS OF FACT**

1.  In September, 2010, the Laramie County Health Department received reports that multiple individuals were sickened after eating at the Old Country Buffet in Cheyenne, Wyoming. On September 30, 2010, health department officials performed an inspection of the

premises and discovered eighteen violations on that day.

2.      The next day, Plaintiffs purchased and consumed food at the Defendants' Old Country Buffet restaurant in Cheyenne, Wyoming.

3.      The food Defendant prepared and served to Plaintiff Chris Gage (hereinafter "Mr. Gage") was contaminated with the *Salmonella* bacteria.

4.      Early the next morning at around 3:00 a.m., after Mr. Gage ingested the food Defendants offered for public consumption, he began to experience gastrointestinal symptoms caused by the *Salmonella* poisoning, including abdominal pain, vomiting and diarrhea.

5.      Mr. Gage's condition progressively worsened. Through the night, Mr. Gage continued to vomit, which turned to retching, dry-heaving with expulsion of blood, and Mr. Gage soiling himself. Mr. Gage continued to deteriorate over the next day or day-and-a-half.

6.      On October 3rd, Mr. Gage could not go to the bathroom on his own or walk without assistance. Mr. Gage could not even hold down water; his dry-heaving and vomiting was continuous. It was at this point that Mr. Gage's wife, Plaintiff Heather Gage (hereinafter "Mrs. Gage"), and Mrs. Gage's sister, Heidi, who is a nurse, decided to call an ambulance to transport Mr. Gage to the emergency room.

7.      When Mr. Gage arrived at Regional West Medical Center in Scottsbluff, Nebraska, he was in total renal failure as a result of the *Salmonella* poisoning and the resulting septic shock. That is the last thing Mr. Gage remembered hearing prior to waking up days later in the intensive care unit. Mr. Gage woke up in pain and he had an incision from his pubic bone to his breastbone.

8.      Medical professionals at the hospital collected a stool sample from Mr. Gage and were able to confirm *Salmonella* poisoning after sending it out for cultures.

9. Mr. Gage was rehydrated while in the hospital to the point that he weighed 309 pounds, having weighed 240 to 245 pounds upon admission. Mr. Gage was so swollen from the fluid that his wound kept trying to open up, requiring retention sutures. Mrs. Gage testified that Mr. Gage was "[u]nrecognizable. You couldn't tell that it was Chris. He was completely full of fluid. He couldn't open his eyes. He couldn't move his hands. Unrecognizable."

10. While still in the intensive care unit, Mr. Gage began experiencing numbness in his legs and feet.

11. Plaintiffs offered, and the Court received, evidence from Dr. Jason D. Walsh, one of Mr. Gage's treating surgeons, about the treatment Mr. Gage underwent as a result of the *Salmonella* poisoning. *See* Hr'g Exhibit 1 (*Declaration of Dr. Jason D. Walsh Under Penalty of Perjury*). Rather than list out each surgery or procedure performed as a result of the *Salmonella* poisoning, suffice it to say that Mr. Gage underwent numerous surgeries and procedures as a result of the *Salmonella* poisoning, including, but not limited to, "a esophageal function test, a esophageal motility study, gastric bypass surgery, repair of hiatal, ventral and internal hernias, the surgical lysis of abdominal adhesions, at least seven (7) esophagogastroduodenoscopy procedures, and multiple laparotomies."

12. Dr. Walsh noted that Mr. Gage had numerous co-morbidities before his exposure to *Salmonella* through food poisoning in October, 2010, and that he was a "particularly vulnerable individual." However, Dr. Walsh opined that Mr. Gage's condition was stable, controlled and asymptomatic (with respect to the reflux) prior to the food poisoning event. Further, Dr. Walsh opined that, to a reasonable degree of medical certainty, the food poisoning was the cause of Mr. Gage's future medical problems. Finally, Dr. Walsh's opinion, to a reasonable degree of medical certainty, is that it is not medically possible to separate Mr. Gage's

4

pre-existing conditions from those Mr. Gage continues to suffer as an exacerbation or aggravation from the *Salmonella* poisoning.

13. Plaintiffs put on the testimony of Dr. Terry Mark Himes, a neurologist. Dr. Himes testified that he performed a physical examination of Mr. Gage, conducted interviews of Mr. and Mrs. Gage, and performed a review of Mr. Gage's medical records, including MRIs of Mr. Gage's head. Dr. Himes noted as follows:

> "....Up until this September illness [i.e., the *Salmonella* poisoning], he was functioning completely independently and with the respiratory problem being his most significant thing that limited his abilities to physically exert himself.
>
> He also had pain and at times had some cognitive issues with his pain medicines, but these were relatively trivial. And he was able to function independently, drive independently, dress himself. He did not require the assistance of anyone."

14. Dr. Himes testified that, based upon his review of the records, his physical examination of Mr. Gage, his interviews, and Mr. Gage's ongoing and unabated symptoms, it is his opinion to a reasonable degree of medical certainty that Mr. Gage suffered an injury to the pons region of his brain as a result of the *Salmonella* poisoning. Specifically, Dr. Himes opined that Mr. Gage suffers from acute central pontine myelinolysis, which is essentially the stripping off of the insulation on the wiring in that part of the brain. Dr. Himes testified that an injury to the pons area of the brain is "virtually unheard of in any other setting than the intensive care unit, where the person is on their deathbed." Mr. Gage was septic, suffering from multiorgan failure, and on his deathbed in the intensive care unit as a result of the *Salmonella* poisoning.

15. Dr. Himes testified that the pons region of the brain is responsible for controlling eye movements; balance; arm and leg movements; fine motor skills; respiration; nausea and vomiting; expression of emotions; and speech and language. Since the *Salmonella* poisoning

Mr. Gage has suffered from persistent nausea, vomiting, balance and coordination issues, cognitive deficits, emotional control issues, and speech and language problems.

16. Dr. Himes testified that this is a permanent injury due to the damage Mr. Gage suffered to the pons area of the brain and that Mr. Gage's condition will continue to deteriorate over time due to "deconditioning." As Mr. Gage ages his condition and disability will only worsen.

17. Mr. Gage's brain injury "impairs his existence 24 hours a day," according to Dr. Himes' uncontroverted testimony. Mr. Gage must now use a cane, walker, or wheelchair for mobility, depending on how debilitating his condition is on any given day. He also uses a van with a lift for mobility. Before his injury, Mr. Gage did not have to use any assistive device for mobility. Mr. Gage is in constant pain and discomfort and is distracted mentally. Mr. Gage did have some prior struggles with depression and anxiety; however, those were significantly aggravated as a result of his brain injury and resulting disability.

18. Mr. Gage is now incapable of caring for himself independently; he needs a host of medications to control his symptoms to some degree; he needs physical and occupational therapy six to eight weeks at a time, twice a year, to try to slow the deconditioning process. Mr. Gage also needs individual therapy to deal with the self-esteem issues that have arisen as a result of his disability, and family or marital therapy to deal with the marital/family issues that come with being disabled and the burden that places on the family.

19. Despite having some respiratory and asthma issues prior to being poisoned, Mr. Gage was capable of living a completely independent life. He was able to bike, hike, cook, drive, manage his finances, shower, brush his teeth, help his son with his homework, socialize with friends and family, go to the movies, eat and drink fluids without vomiting, have intimate

relations with his wife, do his own laundry, do the dishes, manage his own medications, pay the bills and manage the household budget, travel, perform complicated mathematical computations, and do all the everyday things that people normally do.

20. Mr. Gage suffered substantial injuries and changes to his physical and mental well-being since the injury to his pons. Some of those injuries include the following:

a. Mr. Gage is no longer able to independently care for his son, Nathaniel. Also, Mr. Gage can no longer help Nathaniel with his homework. Mr. Gage no longer feels like the good father he was before he was injured.

b. Mr. Gage suffers from balance issues and falls on a regular basis. Mr. Gage broke both feet in falls in 2014. Mrs. Gage estimates that Mr. Gage falls three to four times per week, but she is not aware of all the times he falls because she cannot watch him twenty-four hours a day.

c. Mr. Gage cannot walk without an assistive device—a cane, walker, or wheelchair, depending on what kind of day he is having. Mr. Gage now has to use wheelchair ramp to access his yard and home.

d. Mr. Gage cannot prepare his own meals.

e. Mr. Gage cannot eat or drink without vomiting. Mr. Gage vomits approximately eighty-five to ninety percent of the time when he eats or drinks.

f. Mr. Gage has difficulty showering, combing his own hair, or brushing his own teeth without the assistance of Mrs. Gage due to balance and falling issues.

g. Mr. Gage cannot manage his own medication because of mental confusion. Mrs. Gage must manage his medications.

h. Mr. Gage can no longer pay the bills, do the laundry or dishes, or do the family shopping.

i. Mr. Gage can no longer go to the bathroom without assistance most of the time.

j. Mr. Gage does not socialize with friends as he used to because he constantly vomits and is unwell.

k. Mr. Gage is not able to play catch with his son, take him fishing on a

|     |     |
| --- | --- |
| | regular basis, or teach him such things as how to change the oil in his car. |
| l. | Mr. Gage went from being able to do algebra problems in his head to now struggling with fifth grade math problems. |
| m. | Mr. Gage went from having an almost perfect recall memory to having essentially no functional memory. He cannot remember what he is doing or supposed to be doing. He cannot remember one hour and forty-five minutes after Mrs. Gage has given him his medication whether he has taken his medication. |
| n. | Mrs. Gage has also had to restrict Mr. Gage's freedom to drive because of his cognitive and concentration deficits now. |
| o. | Mr. Gage now suffers from emotional outburst and mood swings. He can be fine one second and crying the next, or fine one second and angry the next without knowing why he is angry. |
| p. | Mr. and Mrs. Gage no longer have a physically intimate relationship with one another. |
| q. | Mr. Gage has experienced a blow to his self-image due to his loss of independence and his lost cognitive functioning. Mr. Gage expressed his sense of uselessness and that he now feels "like an idiot." He now suffers high levels of anxiety and depression. |

21. Mrs. Gage went from having a partner in her husband to being a full-time caregiver to him. Mrs. Gage is in constant contact with Mr. Gage via phone or text when she must leave him for work or school, checking on him every half hour. Mrs. Gage does essentially "everything for Chris now," which was not the case before the *Salmonella* poisoning and resulting injury to his pons. Mr. Gage testified that he does not "feel like a husband anymore....She does everything."

22. Plaintiffs offered, and the Court received, evidence from Dr. Michael D. Shinnick, a life care planner, about the cost of the future treatment Mr. Gage needs as a result of the *Salmonella* poisoning. *See* Hr'g Exhibit 8 (*Declaration of Dr. Michael D. Shinnick Under Penalty of Perjury* and *Life Care Plan for Chris A. Gage*). Dr. Shinnick noted that Mr. Gage was

forty-six and a half years old as of June, 2015. Further, according to the United States Department of Social Security Life Expectancy Calculator, his life expectancy was 35.5 years from that date, or until age 82. Dr. Shinnick noted that Mr. Gage could live longer than his life expectancy with advances in science and medicine, or he could live less due to the *Salmonella* poisoning. Dr. Shinnick outlined Mr. Gage's future care and the corresponding costs of such care as follows:

- Future Medical Monitoring: $378,662.50
- Future Laboratory Testing and Result Analysis: $114,585.48
- Future Office Visits: $160,602.00
- Future Medications post *Salmonella* poisoning: $429,532.96
- Future Equipment: $468,025.00
- Physical and Occupational Therapy and Counseling: $12,013.00[1]
- TOTAL (excluding home health care): $1,563,420.94

Dr. Shinnick, in addition to the expenses listed above, provided estimates for Mr. Gage's future home health care needs, broken down by the number of hours allotted per day. Those numbers are as follows:

- Four hours home health care: $753,594.71
- Eight hours home health care: $1,435,194.71
- Twelve hours home health care: $2,116,794.71
- Twenty-four hours home health care: $3,774,218.71

The total future life care plan with home health care is as follows:

---

[1] It should be noted that this total is only for one year of these services and is not extrapolated over the remainder of Mr. Gage's life, as Dr. Himes, the neurologist, testified was needed at the hearing.

- Total Future Life Care Costs with Four Hours Home Care: $2,317,015.65

- Total Future Life Care Costs with Eight Hours Home Care: $2,998,165.65

- Total Future Life Care Costs with Twelve Hours Home Care: $3,680,215.65

- Total Future Life Care Costs with Twenty-Four Hours Home Care: $5,337,639.65

23. Plaintiffs offered, and the Court received, evidence from Dr. Jerome F. Sherman, an economist, reducing the cost of the life care plan for Mr. Gage to present value. *See* Exhibit 10 (*Declaration of Dr. Jerome F. Sherman Under Penalty of Perjury* and attached *curriculum vitae* and report). Mr. Gage's future life care numbers, reduced to present value, are as follows:

- <u>Future Medical Care, Monitoring and Therapy</u>: $1,089,485.00 at .03% or $1,143,434.00 at -.25%

- <u>Future Equipment</u>: $346,505.00 at 1.77% or $387,251.00 at 1.09%

- <u>Home Health Care *and* Future Medical Care, Monitoring and Therapy, and Future Equipment</u>:

    * <u>Four Hours</u>: $2,185,474.00 at .03% or $2,317,704.00 at -.25%

    * <u>Eight Hours</u>: $2,863,356.00 at .03% or $3,029,536.00 at -.25%

    * <u>Twelve Hours</u>: $3,541,238.00 at .03% or $3,741,367.00 at -.25%

    * <u>Twenty-Four Hours</u>: $5,189,622.00 at .03% or $5,472,304.00 at -.25%

In sum, the present value of the life care plan ranges from $2,185,474.00 or $2,317,704.00 on the bottom end to $5,189,662.00 or $5,472,304.00 on the top end, depending on the number of hours of home health care awarded and the year from which the return on bonds, average increase in inflation, and the average increase in the cost of medical services is calculated.

## CONCLUSIONS OF LAW

1. Because there is no issue of liability here, the Court must determine "the amount

of money that will reasonably and fairly compensate the Plaintiff for those elements of damage proved by the evidence, taking into consideration the nature, extent, and duration of the injury."[2] Mr. Gage has claimed the following damages, which are available under Wyoming law and defined as follows[3]:

    a. The pain, suffering, and emotional distress experienced as a result of the injuries and those reasonably probable to be experienced in the future;

    b. Disability and/or disfigurement;

    c. Loss of enjoyment of life and any loss of enjoyment of life reasonably probable to be experienced in the future. The award for this specific element should not duplicate the award given or any other element of damage;

    d. Medical expenses. The reasonable expense of necessary medical care, treatment, and services received to date and any medical expense reasonably probable to be incurred in the future;

    e. Caretaking. The reasonable expense of necessary help in the home that has been required as a result of the injury and any such help that is reasonably probable to be required in the future.

2.     Mrs. Gage has claimed a loss of consortium, which is available under Wyoming law, and defined as follows[4]:

> If you award damages to Mr. Gage, then you may award damages for loss of consortium to Mrs. Gage. Loss of consortium may include the loss of the injured person's services, society, companionship, affection, love, advice, guidance, and/or sexual relations.

3.     There is no formula for determining damages for pain and suffering, emotional distress, loss of enjoyment of life, disability, disfigurement, or loss of consortium. In fact, the pattern jury instruction in Wyoming concludes as follows: "Any amount awarded rests within

---

[2] *See* W.P.J.I. 4.01: "Measure of Damages – Personal Injury"
[3] *See id.*
[4] *See* W.P.J.I. 4.09: "Loss of Consortium – Spouse"

11

your sound discretion and is for you to determine, taking into consideration the evidence in this case and from your knowledge, observation, and experience in life. Any award should be for what damages are reasonable and just."[5]

    4.    If someone has a pre-existing condition and it is claimed that an intervening injury aggravated that condition, the court or finder of fact should apportion damages, if possible. If it is not possible to apportion damages between the pre-existing condition and the new injury, then all damages incurred since the occurrence should be awarded. *See* W.P.J.I. 4.03; *see also Schaub v. Wilson*, 969 P.2d 552, 556 (Wyo. 1998) ("In cases involving sequential potential causes of a plaintiff's damages, the first question is whether damages can be apportioned among the causes. If so, a defendant is liable only for that portion of the damages that he actually caused. If not, and it can be shown that he aggravated a pre-existing condition, the defendant is liable for the entire disability."); *McLaughlin v. BNSF R.R. Co.*, 300 P.3d 925, 343-37 (Colo. Ct. App. 2012) (detailed discussion of both the eggshell plaintiff and aggravation doctrines).

    5.    If a Plaintiff is claiming future damages, as is the case here, the Court may consider Plaintiff's life expectancy.[6] According to the Wyoming Pattern Jury Instruction Use Note, it is common for the parties to stipulate to the life expectancy based upon mortality tables.[7] In fact, the Use Note provides a link to a government site for mortality tables.[8] *See also Marken v. Empire Drilling Co.*, 75 Wyo. 121, 132 (Wyo. 1956) (mortality tables admissible to show life expectancy).

---

[5] *See* W.P.J.I. 4.02.
[6] *See* W.P.J.I. 4.04: "Injured Party – Life Expectancy"
[7] *See id.*
[8] *See id.*

6.   The Court must determine the present value awarded now for Plaintiff's future injuries.[9] This may be done through expert testimony.[10]

7.   In this particular case, the Court finds that, to the extent Plaintiff suffered pre-existing health conditions, those conditions were severely aggravated and exacerbated by the *Salmonella* poisoning Mr. Gage suffered. Further, the uncontroverted medical testimony before the Court is that it is medically impossible to separate Mr. Gage's pre-existing conditions from those Mr. Gage continues to suffer as an exacerbation or aggravation from the *Salmonella* poisoning. More importantly, the credible testimony of Dr. Himes was that Mr. Gage suffered a new and independent injury to the pons region of his brain as a direct result of the *Salmonella* poisoning. It is this injury, according to the uncontroverted testimony, that is the primary cause of the symptomology that Mr. Gage continues to suffer. This injury, and its debilitating effects, is permanent in nature and will continue to progressively worsen as Mr. Gage ages. The injuries and resulting damages caused by the *Salmonella* poisoning cannot be reasonably apportioned between this occurrence and Mr. Gage's pre-existing conditions.

8.   The Court, on June 30, 2015, awarded the past medical expenses related to this injury, in the amount of $641,936.50 (ECF No. 15). This award will not be duplicated herein, but the record should be clear that this is part of the award and Judgment in this case.

9.   The Court must make a finding and award for Mr. Gage's past non-sum certain damages. Mr. Gage was injured on October 1, 2010, and from that day forth he has suffered considerably, both physically and mentally. As the testimony showed, every aspect of Mr. Gage's life has been negatively affected. He has undergone numerous surgeries and procedures in an attempt to ease his pain and discomfort. He is in daily pain. He cannot eat or drink water

---

[9] *See* W.P.J.I. 4.05: "Present Value of Future Losses – Economic Condition"
[10] *See id. See also Weaver v. Mitchell*, 715 P.2d 1361, 1367 (Wyo. 1986).

without vomiting. In fact, the testimony is that Mr. Gage vomits eighty-five to ninety percent of the time when he eats or drinks. His mobility has been taken from him. He falls on an almost daily basis, which has caused him to break bones. He requires a cane, walker, or wheelchair for mobility, depending on how debilitating his condition is on any given day. His cognitive functioning has been significantly impacted. His relationships with his wife and son have been adversely affected. The Court finds that an award for past pain, suffering, and emotional distress experienced as a result of the injuries; disability and disfigurement; and loss of enjoyment of life in the amount of $1,000,000.00 is fair and just considering the nature and extent of Mr. Gage's damages.

10. The Court must make a finding and award for Mr. Gage's future non-sum certain damages. Again, the uncontroverted testimony was that Mr. Gage's condition is permanent in nature and that he will only get progressively worse over time due to the "deconditioning" process associated with the injuries Mr. Gage suffered as a result of the *Salmonella* poisoning. According to Plaintiffs' life care planner and publically available mortality tables, Mr. Gage's life expectancy is approximately thirty-five years from the entry of this order. That number could possibly be more with advances in health care and science, or less if Mr. Gage succumbs to his injuries and deconditioning. The Court finds it appropriate and proper to base Mr. Gage's future damages on an average life span. Accordingly, for the next thirty-five years Mr. Gage can look forward to a life of pain, suffering and hardship as he continues to struggle with even life's most basic tasks, such as eating and bathing. As the years pass, Mr. Gage's struggles will continue to become greater. The Court finds that an award for future pain, suffering, and emotional distress experienced as a result of the injuries; disability; and loss of enjoyment of life in the amount of $5,500,000.00 is fair and just considering the nature and extent of Mr. Gage's

damages.

11. The Court must make a finding and award for Mr. Gage's future medical expenses and caretaking needs. The uncontroverted evidence was that Mr. Gage is now incapable of functioning independently. Mr. Gage requires attendant care for many of the activities of daily living. Currently, it is Mrs. Gage who has taken on the lion's share of his care. However, the Court finds it inappropriate to give Defendants a credit for the gratuitous services it is anticipated that Mrs. Gage may perform in the future. First, while Mrs. Gage is clearly a devoted and loving wife, there is no guarantee that she will be capable of performing all the tasks Mr. Gage needs to function day-to-day. Caregivers are sometimes injured or rendered incapable of performing services. In addition, the strain of becoming a full-time caregiver for another adult cannot be underestimated. Mrs. Gage testified to the burden this has placed upon her and their relationship. Finally, Defendants should not reap a future benefit from the fact that Mrs. Gage, until now, has chosen to perform attendant care for Mr. Gage out of the sense of loyalty and devotion she has felt as a loving wife. Under Wyoming law, even gratuitous services are compensable to ensure that tortfeasors realize the full extent of their harm. *See, e.g., Garnick v. Teton County Sch. Dist. No. 1*, 2002 WY 18, ¶ 14, 39 P.3d 1034, 1041 (Wyo. 2002) (tortfeasor responsible for the full extent of the harm, even if services provided gratuitously). Dr. Himes testified that Mr. Gage needs at least four hours attendant care per day, assuming that Mrs. Gage continues to perform the bulk of the care Mr. Gage needs. The evidence before the Court demonstrates that caring for Mr. Gage is a full-time job. From the time Mrs. Gage rises in the morning to the time Mr. Gage goes to bed in the evening, Mrs. Gage is devoted to caring for Mr. Gage and guarding against him falling or hurting himself. When Mrs. Gage has to leave during the day for work or school, she is in contact with Mr. Gage every thirty minutes to ensure his

safety. As has been noted, this situation will only become more onerous and burdensome in the future. Accordingly, the Court finds that an award for future medical care and home health care in the amount of $3,029,536.00 is fair and just considering the nature and extent of Mr. Gage's damages. This is the uncontroverted amount offered by Dr. Shinnick, reduced to present value, including eight hour home health care for Mr. Gage. The Court finds that this award is reasonable and appropriate for Mr. Gage to maintain what quality of life he has been left with after the *Salmonella* poisoning.

    12.    The Court must make a finding and award for Mrs. Gage's loss of consortium claim. Mrs. Gage has gone from having a partner in life to being a full-time caretaker for her husband. Mrs. Gage testified that she has lost her "husband and partner. That's been my greatest loss." Mrs. Gage and Mr. Gage are no longer able to socialize with friends and family as they did. They can no longer enjoy a movie and dinner as husband and wife. They cannot engage in marital relations due to Mr. Gage's condition. Mrs. Gage has lost the ability to share household tasks with her husband. Mrs. Gage cannot have sustained or intellectual conversations with Mr. Gage due to his cognitive deficits. Mrs. Gage deals with Mr. Gage's mood swings. Mrs. Gage testified that her husband's injuries and her role as caretaker have caused her significant stress and worry. She now has to take medication in order to fall asleep because she worries so much. Mrs. Gage expressed that when she and Mr. Gage were married she "thought [they] could build a future together." However, she feels that because of the *Salmonella* poisoning's devastating effects, "that future has been taken away now." Accordingly, the Court finds that an award for loss of consortium in the amount of $1,200,000.00 is fair and just considering the nature and extent of Mrs. Gage's loss.

    THEREFORE, JUDGMENT CONSISTENT HEREWITH SHALL BE ENTERED IN

FAVOR OF PLAINTIFFS AND AGAINST DEFENDANT.

FOR ALL OF WHICH, EXECUTION AND ENFORCEMENT SHALL ISSUE.

**IT IS SO ORDERED.**

DATED this 22nd day of October, 2015.

_____
Scott W. Skavdahl
United States District Court Judge